UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CONTINENTAL CASUALTY INSURANCE COMPANY, as subrogee of R.A.B. HOLDINGS, INC., : : : : Plaintiff, : : v. : : DARELLA ELECTRIC, INC., : : Defendant/Third Party Plaintiff, : : v. : FACILITY PROGRAM MANAGEMENT, INC., et al., Third Party Defendants. | Civil Action No. 08-683 (SRC)  **OPINION** |

**CHESLER**, District Judge

      This matter comes before the Court on the motion for summary judgment by Defendant Darella Electric, Inc. ("Darella") [docket entry 24]. Opposition has been filed by Plaintiff Continental Casualty Insurance Company ("Continental Casualty") [docket entry 33] and by Third Party Defendants Facility Program Management, Inc., The Facility Design Group, Inc. and The Facility Group, Inc. (collectively, the "Facility Group") [docket entry 32]. This Court has reviewed the papers filed by the parties in connection with the instant motion for summary judgment and rules based on those submissions, and without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the following reasons, Darella's motion for summary judgment will be granted in part and denied in part.

I.  **BACKGROUND**

This subrogation action concerns property damage sustained by R.A.B. Holdings, Inc. ("R.A.B."), the insured and subrogor of Plaintiff Continental Casualty, during a renovation project in which Darella and the Facility Group were involved as subcontractor and contractor, respectively.  The motion before the Court centers on whether, pursuant to contract, R.A.B. waived its subrogation rights with respect to Darella.  The Court will thus provide only a brief synopsis of the facts relating to the services and damage out of which this dispute arises before turning to analysis of the relevant contractual provisions and law.

On June 1, 2006, R.A.B. Food Group LLC entered into a "Cost Plus a Fee Contract" with Facility Program Management, Inc. for the performance of design, construction and installation services in connection with a Plant Consolidation Project (the "R.A.B. Project") of R.A.B.'s food processing plant in Newark (the "R.A.B. Property").  (The Court will refer to this contractual agreement between R.A.B. and Facility Program Management, Inc. simply as the "Contract.")  The Contract expressly permitted the Facility Group to enter into subcontracts to perform the work covered by the Contract.  In performance of its obligations under the Contract, the Facility Group requested a bid from subcontractor Darella for certain electrical work, including the installation of a new power service transformer and new underground conduits to carry six 3,000-ampere conductors on the R.A.B. Property.  At some point between the initial bid request and the finalization of the subcontract, the specifications for the work were changed so that the conductors would be installed in the steel conduit already in existence, rather than replacing the conduit.  The March 30, 2007 subcontract entered into by Facility Program Management, Inc.

and Darella (the "Subcontract") required, among other things, the installation of the six 3,000-ampere conductors into existing conduit.

Darella's work involving the removal of old conductors and installation of new conductors on the R.A.B. Property began in or about April 2007. On April 13, 2007, after this installation was completed, and after it had been inspected by both the City of Newark and the electric company, Public Service Electric & Gas ("PSE&G"), PSE&G turned on electrical service to the transformer associated with the new conductors, energizing the new conductors. Days later, an R.A.B. representative contacted Darella regarding a popping sounding heard in the area of the switch block for conductors at issue. In response, Darella's foreman for the electrical work on the R.A.B. Project, together with a PSE&G technician, inspected the area. Upon discovering some damage to one of the new conductors and the poor condition of the conduit's end, the Darella foreman performed repair work, which included applying a cold shrink to repair damaged insulation on one conductor and applying extra insulation material to the remaining conductors.

On May 29, 2007, a "catastrophic failure" of the new conductors occurred. Following this, the Facility Group issued a change order calling for Darella to install new conductors in new conduit. During the course of this work, portions of the existing conduit were removed from the ground. At this point, it was discovered that the existing conduit was in a very poor and corroded condition and that the site in and around which the conduit was located was quite deteriorated, among other reasons, due to water carried to the area by a decomposed storm pipe.

The failure of the new conductors and related power outage caused substantial damage to the R.A.B. Property. R.A.B. received $264,771.10 in benefits from its insurer, Continental

Casualty, on the claim it filed in connection with this damage. In return, R.A.B. subrogated its rights against Darella to Continental Casualty. In the lawsuit before this Court, Continental Casualty alleges that Darella's negligence caused the R.A.B. Property damage. Its theory of the case is that the substandard and degraded condition of the existing conduit into which the new conductors were installed damaged the conductors' insulation and that Darella's failure to perform with due care all work related to the installation, including inspecting and testing the conduit for suitability, resulted in the failure and property damage.

On October 20, 2008, Darella filed a Third Party Complaint against the Facility Group for contribution and common law indemnification, alleging that the Facility Group provided Darella with designs and directions for the R.A.B. Project's electrical work and ordered the new conductors to be installed into existing conduit without first making adequate observations of site conditions and/or without requiring Darella to inspect the conduit for suitability. By letter of May 18, 2009, the Facility Group demanded indemnification and defense against these claims from Darella pursuant to the Subcontract. Darella did not accept the tender of defense, and the Facility Group counterclaimed to enforce its rights of defense and indemnification.

## II. DISCUSSION

### A. Legal Standard

The standard upon which a court must evaluate a summary judgment motion is well-established. Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 247-48. The Supreme Court has held that and Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but "must exceed the 'mere scintilla' threshold").

The motion for summary judgment before this Court has two aspects. Darella moves for summary judgment on Continental Casualty's Complaint. It also moves for summary judgment on the Facility Group's counterclaim against Darella to enforce the Facility Group's contractual rights to indemnification and defense. The Court will consider each in turn.

**B.      Summary Judgment on Continental Casualty's Claim**

Continental Casualty's Complaint against Darella pleads only one claim, for negligence, in connection with Darella's work on the R.A.B. Project. Darella moves for summary judgment on the grounds that, pursuant to the subrogation waiver given by subrogor R.A.B. in the Contract, Continental Casualty is barred from pursuing this negligence claim in subrogation. Continental Casualty counters that the waiver does not run in Darella's favor.

The Court begins its analysis in recognition of the well-established rule under New Jersey law that "normally, a carrier paying an insurance loss is entitled to subrogation against the tortfeasor." Continental Ins. Co. v. Boraie, 288 N.J. Super. 347, 349 (App. Div. 1995) (citing Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 104 A.2d 288 (1954)). It is equally well-established, however, that the "rights of a subrogated insurer can rise no higher than the rights of its insured." Id. (quoting Foster Estates, Inc. v. Wolek, 105 N.J.Super. 339, 341 (App. Div. 1969)). The alleged tortfeasor has available to it all defenses against the subrogee as it would have against the subrogating insured. Id.

There is no dispute that the Contract between R.A.B. and Facility Program Management, Inc., the contractor on the R.A.B. Project, contains a provision requiring R.A.B. to obtain certain insurance coverage. It states:

> Owner [R.A.B. Food Group, LLC] shall purchase and maintain property insurance upon the entire Work at the site to the full value thereof. Such insurance shall cover the interests of the Owner, Builder [Facility Program Management, Inc.], subcontractors and sub-subcontractors in the Work, shall insure against all perils covered in an "all-risk" form and **shall contain an acknowledgment from the insurer which bars all rights of subrogation against the parties insured**, it being specifically understood that all rights of Builder and Owner against each other for damages caused by fire or other perils to the extent covered by insurance provided under this subparagraph C are waived.

(Contract, ¶ 21.C (emphasis added). (The Court will hereinafter refer to the foregoing provision as the "Insurance Provision.") There is, moreover, no dispute that subrogation Plaintiff Continental Casualty is the "insurer" referenced in the Insurance Provision. In light of New Jersey's law regarding the rights of subrogated insurance companies, as articulated in Boraie and the authority cited therein, Continental Casualty is bound by that provision to the same extent as its subrogor, R.A.B. Continental Casualty acknowledges that the Insurance Provision contains waiver of subrogation language. Thus, the critical question on this motion for summary judgment is, does the Insurance Provision's waiver provision run in favor of Darella, such that Darella can assert it as a defense against Continental Casualty's negligence claim?

The Court concludes that it does. Clearly, the provision quoted above obligated R.A.B. to obtain property insurance covering the interests of, among others, the "Builder" – meaning the Facility Group – *and its subcontractors* in the "Work" - that is, in the R.A.B. Project. Further, the coverage was to insure "all perils." The Facility Group subcontracted with Darella for the performance of certain electrical work in the R.A.B. Project, and Darella is being sued here for its allegedly negligent performance in the R.A.B. Project. The provision, thus, required coverage

for subcontractor Darella encompassing the subject matter of this lawsuit. It required, moreover, that such insurance policy contain a waiver of subrogation by the carrier selected by R.A.B. as to the "parties insured" – which, by reference to the preceding clause requiring the interests of subcontractors to be covered by the insurance policy - must be read to include Darella.

Continental Casualty nevertheless seeks to avoid the contractual obligation undertaken by its subrogor to waive subrogation rights against Darella by arguing (1) the insurance policy between R.A.B. and Continental Casualty (the "Policy") neither identifies Darella as an "insured" nor contains a subrogation waiver acknowledgment; (2) the Contract's Insurance Provision required only the "interests" of subcontractors to be insured, not the subcontractors themselves to be listed as named or additional insureds under the Policy; (3) the interests of Darella had ceased by the time of the litigated incident because, according to the Subcontract, title to Darella's work in the R.A.B. Project passed out of its hands upon "physical incorporation" of its work into the R.A.B. Project; (4) the Insurance Provision expressly limits any subrogation waiver to run only between "Builder and Owner"; and (5) any exculpatory effect of the provision as to Darella would be inconsistent with indemnity provisions in the Subcontract, whose terms expressly provide that the Subcontract governs in the event of inconsistency. These arguments are unavailing.

First, the Court quickly dispenses with Continental Casualty's reliance on what the Policy actually covers. The fact that it does not list Darella as an insured is inapposite, because what governs here is what Plaintiff's subrogor was bound to do under the terms of the Contract. See Boraie, 288 N.J. Super. at 354 (holding that insurance company's subrogation suit against alleged tortfeasor could not proceed, even though policy at issue failed to contain subrogation waiver,

8

because insurance company's subrogor had been required by lease contract to obtain policy including waiver).

Second, the limits Continental Casualty reads into the subrogation waiver clause of the Insurance Provision contravene well-established principles of contractual interpretation. In particular, Continental Casualty injects ambiguity into the Insurance Provision by reading the words "parties insured" in the subrogation waiver clause in isolation from the clause requiring the interests of subcontractors in the R.A.B. Project to be insured. This approach allows Continental Casualty to consult extrinsic evidence, specifically, the Subcontract, to argue that any possible waiver of subrogated rights encompassing Darella is negated by the Subcontract's terms.

The Court will not, however, consider any evidence extrinsic to the Contract because it perceives no ambiguity as to the reach of the waiver of subrogation included in the Insurance Provision. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 192 (App. Div. 2002) (holding that, where meaning of contractual term is unclear or ambiguous, party may present extrinsic evidence to demonstrate term's meaning). In rejecting Continental Casualty's arguments, the Court is guided by the following applicable principles of construing contracts under New Jersey law:

> The court makes the determination whether a contractual term is clear or ambiguous. An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their "plain and ordinary meaning." The court should examine the document as a whole and the court should not torture the language of a contract to create ambiguity.

Id. at 191 (citations and internal quotations omitted).

The express terms of the Insurance Provision require a waiver of subrogation rights as to the "parties insured." This term must be given it plain and ordinary meaning, which read in the context of the entire provision, refers to those for which insurance coverage was to be obtained: "Owner, Builder, subcontractors and sub-subcontractors." Indeed, these categories are listed in an earlier clause of the same sentence which bars subrogation rights against the "parties insured." According to Continental Casualty, however, this reading would be too expansive, as the Insurance Provision required only the "interests" of such parties in the R.A.B. Project to the insured, not the parties themselves. Continental Casualty's interpretation, distinguishing interests from the parties possessing such interests, tortures the language of the Insurance Provision to render "parties insured" without definition and the intended reach of the subrogation waiver unclear, except by reference to the Policy and the Subcontract. The Court cannot accept this alternative interpretation as a reasonable one.

Nor can it accept that the bar on subrogation rights applies only as to the "Builder" based on the phrase that concludes the sentence specifying what R.A.B. must include in the required policy of property insurance. That phrase reads: "it being specifically understood that all rights of Builder and Owner against each other for damages caused by fire or other perils to the extent covered by insurance provided under this subparagraph C are waived." This phrase contains no words of limitation with respect to the scope of the subrogation waiver, which the sentence has earlier established applies to those parties for which insurance must be obtained. That list of parties includes, but is not limited to the Builder. Read in context with the entire Insurance Provision, this phrase expresses the contracting parties' understanding that between themselves there shall be no recovery for damages insured against. To read it as a phrase of limitation on the

10

subrogation bar would be contrary to the words chosen by the contracting parties and, moreover, produce a result at odds with the rest of the Insurance Provision.

The Contract, the Court concludes, bars Continental Casualty's subrogation claims in this action. "Although the right of an insurance company to enforce subrogation rights in appropriate cases has long been well settled, it is also clear that subrogation is not applicable when its enforcement would be inconsistent with the terms of a contract or where the contract, either expressly or by implication, forbids its application." Boraie, 288 N.J. Super. at 351 (quoting the opinion of Judge Ackerman, then of the state court of New Jersey, in Mayfair Fabrics v. Henley, 97 N.J. Super 116, 126 (Law Div. 1967)). In light of the Contract made by its subrogor, Continental Casualty could not, as a matter of law, prevail on its claims to recover for the losses sustained by the subrogor allegedly as a result of Darella's negligence.

Accordingly, the Court will grant Darella summary judgment on Continental Casualty's Complaint.

### C. Summary Judgment on The Facilities Group Third-Party Counterclaim for Defense and Indemnity

The theory of Darella's third-party claims is that responsibility for the loss at issue lies with the Facility Group because it provided the project design calling for installation of the new 3,000-ampere conductors into existing steel conduit and neither inspected the site conditions itself - as Darella contends it should have - nor expressly tasked Darella with doing so under the Subcontract. The Facility Group counterclaimed for defense and indemnity from Darella,

pursuant to the indemnity provision in the Subcontract. Darella seeks summary judgment on that counterclaim, arguing that as the loss resulted from the Facility Group's own negligence, it falls outside the scope of the Subcontract's indemnity provision.

The Court notes initially that, despite its holding that the direct claims against Darella to recover the loss at issue are barred and therefore will be dismissed on summary judgment, the Facility Group's counterclaim for indemnification and defense is not moot. Clearly, Darella's Third Party Complaint against the Facility Group is no longer viable, as there can be no damages on which to base Darella's claims for contribution and common law indemnification. The Facility Group's counterclaim, however, remains at issue because it seeks recovery of the defense costs it has incurred as a result of Darella's third-party action against it. The indemnity provision at issue, quoted below, contains an obligation to defend. Under Georgia law, which the Subcontract provides will govern its defense and indemnity provisions, "the duty to defend and the duty to pay are independent contractual obligations." ALEA London Ltd. v. Woodcock, 286 Ga.App. 572, 578 (2007); see also George L. Smith II Georgia World Congress Ctr. Auth. v. Miller Brewing Co., 255 Ga.App. 643, 644 (2002) (holding lessor indemnitee not entitled to recover attorneys' fees from indemnitor lessor in defending personal liability action because contractual indemnity provision did not expressly contain an obligation to defend indemnitee).

The indemnity provision in the Subcontract states as follows:

> Subcontractor [Darella] shall, to the fullest extent permitted by law and to
> the extent that any such claims, losses, liabilities and/or expenses are
> caused in whole or in part by any act or omission of Subcontractor, anyone
> directly or indirectly employed by Subcontractor or anyone for whose acts
> Subcontractor may be liable, regardless of whether any such claims,
> losses, liabilities or expenses are caused in part by a party indemnified

>   hereunder, indemnify, hold harmless and defend each and all of the
>   Indemnitees from and against any and all claims, losses, liabilities and/or
>   expenses, including attorneys' fees, arising out of or in a manner caused
>   by, connected with or resulting from the performance of this Subcontract
>   and/or the Work.  The indemnity obligations herein of Subcontractor shall
>   not be negated, abridged, reduced and/or otherwise limited in any way by
>   or on account of any damages, compensation and/or benefits payable under
>   any insurance policies or the Bonds or under any workers' compensation
>   acts, disability benefit acts or other employees' benefit acts.

(Subcontract, ¶ 9.)  A contractual indemnity provision must be strictly construed against the indemnitee, in this case the Facility Group.  Svc. Mcds. Co. v. Hunter Fan Co., 274 Ga.App. 290, 296 (2005).

Darella argues that this provision could not, as a matter of law, cover its third party claims to shift responsibility for the loss onto the Facility Group because the loss is attributable to the negligence of indemnitee the Facility Group.  Under Georgia law, and indemnitee cannot be indemnified for its own negligence unless the contract between indemnitor and indemnitee expressly provides.  Id.  Darella argues that the Subcontract limits its obligation of indemnity to losses "caused in whole or in part" by Darella in a manner connected with its performance of the "Work."  According to Darella the loss stems from the Facility Group's design decision to use existing steel conduit, and thus was neither caused by Darella nor attributable to the "Work" Darella was retained to perform under the Subcontract.

Contrary to Darella's reading of the indemnity provision, the Court notes that it does expressly provide for indemnity in situations involving the Facility Group's negligence.  Indemnity lies "regardless of whether any such claims, losses, liabilities or expenses are caused *in part* by a party indemnified hereunder."  (Subcontract, ¶ 9 (emphasis added)).  Reviewing a

subcontract containing a similar indemnity provision, the appellate court of Georgia regarded the language as effective to secure indemnification on claims for which an indemnitee may have been partially responsible with the indemnitor subcontractor as joint tortfeasors.  BBL-McCarthy LLC v. Baldwin Paving Co., 285 Ga.App. 494, 500-01 (2007) (citing Seaboard Coast Line R. Co. v. Dockery, 135 Ga.App. 540 (1975)).  The Court, however, need not make any determinations regarding whether such a clause suffices under Georgia law to shift liability for a party's own negligence to another.

Apart from that language, the Court finds that Darella has failed to carry its burden under Rule 56(c) to demonstrate that no question of material fact exists with regard to the applicability of the Subcontract's indemnity provision.  It applies to the "Work" Darella was retained to perform, but there are genuine disputes as to the scope of the subcontracting parties' responsibilities.  The record before the Court presents conflicting deposition testimony and documentary evidence on the issue of fault for the conductor failure, including which entity bore responsibility for inspecting and ensuring the quality of the existing conduit, for making the decision to proceed with the existing conduit and for testing for suitability before and after installation of the new conductors.  There are no expert reports concerning responsibility for such matters and/or whether the parties discharged their responsibilities with ordinary care in the field of electrical installation.  Simply put, the Court cannot hold as a matter of law that the claims filed by Darella against the Facility Group do not fall within the indemnity provision and therefore did not trigger Darella's obligation thereunder to defend the indemnitee.

This aspect of Darella's motion for summary judgment will accordingly be denied.

### III. CONCLUSION

For the foregoing reasons, the Court grants Darella's motion for summary judgment on Plaintiff Continental Casualty's claims against it but denies its motion for summary judgment as to Third Party Defendant the Facility Group's counterclaim for defense pursuant to the Subcontract between those parties. An appropriate form of Order will be filed together with this Opinion.

                                                  s/Stanley R. Chesler
                                                  STANLEY R. CHESLER
                                                  United States District Judge

DATED: February 9, 2010